Case number 16-5086, MetLife, Inc. v. Financial Stability Oversight Council Appellant. Mr. Stern for the appellant, Mr. Scalia for the affiliate. May it please the Court, I'm Mark Stern for the Financial Stability Oversight Council. Through an elaborate process that took about a year and a half, the Council determined that material financial distress at MetLife could threaten the nation's financial stability. It's undisputed that that is the relevant statutory standard, and it's also undisputed that MetLife considered each of the specified factors that are laid out in the statute to inform the Council's determination. Now, when the District Court set aside the collective determination of the nation's chief financial regulators, which probably is a non-delegable determination that has to be made by a two-thirds vote, the Court cited two departures from the Council's own guidance and one departure from what the Court believed was required by the statute. And the departures from the guidance were the Court's view that the Council was required to determine the likelihood that, or at least consider, rather, consider the likelihood that MetLife would experience, self-experience, material financial distress, and it also found that the Council had failed to predict with adequate specificity the ways in which material distress at MetLife could destabilize the economy. The statutory departure that the Court identified was a failure to do a cost-benefit analysis. Can we start with the first issue you raised about the departure from the guidance on the question of likelihood that the company would fall into financial distress? Is it your view that the guidance just cannot be read that way, or is it your view that the guidance need not be read that way, and the Council later on fleshed out that it need not be read that way? We don't actually think that it can be read that way, and we think that there is a mention of vulnerability in the statute that the District Court relied on, but what the Council specifically said was it wasn't adding any new factors that weren't set out in the statute itself, and it explained that there were, that this category, you know, that it described as being sort of related to vulnerability sort of indicated what the factors were, and then it's not controverted that it applied all of those factors. If the argument is that it cannot be read that way, which is the more aggressive position, can I just ask you to address, there's versions of it, but in your brief, I guess there's an addendum that has the guidance in it, and if we look at the portion that talks about leverage, and it's the addendum, page 17, under the heading leverage, the first sentence is, in relation to its equity capital, leverage amplifies a company's risk of financial distress in two ways, and then it goes on to discuss two ways, the subsequent two sentences, and then subsequently, it says leverage can also amplify the impact of a company's distress on other companies, so that part of it clearly is speaking to ripple effects for the broader economy. On the sentences before that, the first and the second, how do you read those sentences in support of your conclusion that the guidance cannot be read to speak to likelihood that a company will fall into distress? What the counsel is trying to determine is not whether but how distress will affect an institution, in this case, MetLife, and how it's going to affect that institution is relevant, because in turn, as your Honor suggests, leverage, liquidity, maturity, mismatch, all of those things are ultimately relevant to the determination that the counsel is required to make, which is if there is financial distress, material financial distress at a company, will that distress have a destabilizing, could that material financial distress have a destabilizing impact? That's the ultimate question. That's definitely right, or it seems that you have the strongest position on that with respect to the sentence that follows first and second, and the sentences that are first and second, it sounds to me like what you're saying is those don't go to the likelihood that the company will fall into financial distress. Those go to the implications for the company if there is financial distress. Yes, that's how the counsel has understood this throughout. It did it in its previous determinations, made clear throughout this process that that's what it was doing. It provided MetLife with a sort of proposed designation, which made clear how it was analyzing it. There's no sort of argument here that MetLife in some way was prejudiced by the counsel's understanding of its guidance. It got to make all the arguments, present all the evidence. It argued to the counsel that the counsel should consider its likelihood of material distress. It understood that that isn't what the counsel was doing. The counsel responded to that, and there's a discussion of it in its final determination. But that's consistent both with the overarching statute and everything that the counsel has ever done, and there's a reason for that because the idea that you could predict, among other things, the idea that you could predict the likelihood that a particular entity is going to experience financial distress is not what Congress had in mind. Congress was reacting to events like the collapse of AIG. If you had to scroll back to 2005 and predict whether it was likely that AIG was going to experience material financial distress, probably the only people who would have said that were the guys in the big short who sort of were out ahead of everybody. Nobody else was thinking that. And the idea that you could predict with any kind of specificity what losses would be and who would experience them, again, AIG is instructive. I mean, AIG down to its last weekend was increasing its estimates of its liquidity shortfall by sort of repeatedly doubling over the course of days what it was, so that the idea that sort of the counsel looking to the indefinite future is going to make a prediction about the financial health. It didn't make a prediction. The prediction was there's a hundred percent chance it's going to fail. And now this is – so we'll just take a look at what the consequences are. That's a prediction, isn't it? No, Your Honor. It's – I mean, certainly the counsel never predicted that there's a hundred percent chance that MetLife is going to fail. What the counsel took as an assumption, and that's what the stack is. That's what the assumption is. Well, the working assumption is that it's facing imminent insolvency.  So the question is, if you're in that position, how is that likely to affect you? And if you are a highly leveraged company, if you've got a mismatch between what money you think you owe and money that you've got in terms of your ability to liquidate your assets, if you engage in certain kinds of transactions, all of those things are going to make you more likely to have an effect on the broader market than if you are – you know, have little leverage, you know, and are highly liquid. And then size and interconnectedness are, of course, crucial. I mean, these things are all related. Can I ask where you think in the counsel's final determination are the best pages where it applied vulnerability in the way that you are describing it here? Oh, gosh, the best pages. Because at least in the executive summary to start, they lay out vulnerability, but then they seem to only talk about transmission, which I thought was the second half of the test. And so it's – I'm trying to see where they're clearly embracing this understanding of vulnerability. Yeah, I mean, I think a whole bunch of the – like, I mean, like the counsel talks about, like, leverage at JA554, and it talks about – Let me just start on JA390. So I'm just starting with the executive summary, but they talk about vulnerability,  and here they're talking about leverage, liquidity risk, and maturity mismatch. So your three vulnerability factors are relevant to assessment of whether and how material financial distress in real life could be transmitted to other financial firms and markets. And that seemed to me the second half of this analysis. First, we see how bad it's going to affect you. Are you going – what kind of wherewithal do you have as a company to survive this? And if it's not good, what – the second inquiry is what effect is whatever you're having to do going to have? How is it going to be transmitted? Yeah. So that's why I'm confused. Yeah, no, I mean, I think that the thing is that they're both true. I mean, these are all – I mean, like, as the counsel explained, it was that these were all interrelated factors, and Congress understood them to be interrelated factors. So what – you know, your leverage, you know, the kinds of businesses you engage in, go to your vulnerability, you know, in the sense that how is it – like, what are you likely to do? You know, what problems will you be facing? And then those feed also directly into the questions of your size, your interconnectedness, who are you dealing with, you know, what it will be, the impact. But, you know, the counsel goes through. I mean, it's indicated what – I think – I thought what Judge Melissa is getting at is that there's a sequence. The sequence is distress could come up along three points in the continuum. The first would be likelihood that the company is going to fall into distress, and the vice position is that has to be considered. Your position is no, that doesn't have to be considered. In fact, the guidance doesn't talk about considering that at all. The second step is, in conditions of distress, how does it affect the company? And then the third is, if it affects the company, then what are the outward ripple effects of that for the broader market? So on the second part of that continuum, the question is, where in the executive summary is that second part addressed? And that I would have to look back to see what I can tell you is that there's no dispute that MetLife, the brother of the counsel, considered all the factors that it deemed relevant, that it sort of grouped as being sort of the more inward looking. And it looks at those factors not because it's trying to predict whether any institution is going to fail under certain circumstances. There may be lots of institutions that are going to fail, and that could be very unfortunate for the stockholders of those institutions. Well, how do you read this sentence? Because on that same page in that paragraph, the one that Judge Millett's looking at on JA 390, there's a, after a semicolon, it talks about what Section 4.3.3 is going to describe. Section 4.3.3 describes how MetLife's securities lending activities result in liquidity risk and a maturity mismatch that could cause the company to rapidly liquidate invested collateral to produce the necessary liquidity to return cash collateral to its securities lending counterparties. And when it talks about the company, do you read that to mean likelihood that the company is going to fall into distress? Do you read it to mean likelihood or consequences for the company in conditions of distress, or do you read it to go to the third part, which is implications for the broader market? Well, both. And what it's saying is that if you have, like, leverage and if people can demand money from you sort of based on all sorts of financial instruments, and particularly if you have, you know, $100 billion, you know, or $90 billion just in the capital markets alone that would fall into that category, then when you are in trouble, what you may do is to try to liquidate your assets, and then that in turn flows into the way you're going to affect the broader market. But it's so that there's an inquiry. Are you the sort of company that will need to liquidate assets? Is the way you're doing business sort of getting you there? And then what will the result be? If you're an enormous interconnected company, well, that's going to have a big effect on the broader market. You know, if you're not like that, you know, you may be in trouble, but it's not going to have enormous reverberations throughout the entire economy. I see that my time is up. All good. Thank you. Thank you, Your Honor. Good morning. May it please the Court. Eugene Scalia representing MetLife. All MetLife asks in this case is that FSOC be held to the standards articulated by the Supreme Court in the State Farm decision and applied by this Court for decades, including that it adhere to its own standards, that it base its decision on evidence and applied expertise rather than implausible speculation and ipsy-dixit, that it respond to significant evidence and argument in the record, and that it consider the impact of its actions, including superior alternatives to that course of action, and finally, that it accord due process. On the topic of its standards, let me begin with vulnerability, but also talk about how it also departed from its own standards when it came to the exposure analysis. First, Judge Sirvason, in addition to those passages that you pointed out in the final rule interpretive guidance that seemed to be concerned about the occurrence of financial distress, I would also mention, and I don't have the same pagination as you do, but later there are references, for example, to whether how well the company, quote, is matching the repricing and maturity of its assets and liabilities is matching. How is it doing it currently? Because maturity mismatch is one potential onset of financial distress in a generally bad economic environment. It also talks, this is page 26 in our appendix, also discusses whether there is regular reporting to state regulators. Well, that naturally goes to the question of whether the state regulators are on the job and able to discern conditions that could be indications of the likely onset of distress, whether there are reporting obligations can be far less helpful once a company already is there. Even more importantly, though, if I can emphasize the dog that doesn't bark, the premise, the starting point of this final designation is, as Judge Randolph said, total failure. That was an easy thing to say in the final rule of interpretive guidance. We are going to assume an onset of absolutely totally debilitating financial distress, and it's actually remarkable that Mr. Stern has cited you to join appendix 454 because at that page there's an assumption actually of deep insolvency, and on the same page FSOC goes on to assume something even worse than deep insolvency. Judge Millett, this is in part relevant to some of the questions that you had because they actually never even do their own made-for-litigation inquiry regarding vulnerability to vulnerability. They just plunge MetLife to whatever depths are necessary without any serious examination of how it got there. Again, on the question of what was said in the final rule in interpretive guidance, they said they were going to look at two things, and some of your questions picked up on this. Transmission to third parties, vulnerability of MetLife. But on those pages that we were looking at, 390 to 391, those were conflated. All they talk about is three different times they talk about transmission to third parties or impact on third parties. That second prong, vulnerability of MetLife, is just gone from that analysis. I also want to note that what FSOC did was it told state regulators it was going to examine MetLife's vulnerability to financial distress and on that basis sought thousands of pages of documents from it that went to MetLife's stability and soundness, such as stress tests going back to 2007. Can I ask you something? Is your view that the statute itself requires the council to find an actual likelihood of falling into financial distress or that that's entirely a product of the guidance? We believe that that's the best interpretation of the statute. What's statutory? Can you help me with the statutory language? I'll just flag a couple things for you. One is in 5322 when they set out the purposes and duties of the council in A1H, I think. That's correct. They phrase it as terms of companies that may pose risks in the event of their financial distress or failure and then obviously the money language most folks are talking about in 5323A1 emphases on could pose. Neither of those are posing a threat to the financial stability because of their material financial distress. It's all in the event of or could it pose, and hypothesizing language like that, which doesn't seem to me as a textual matter in the statute, put aside the guidance right now, in the statute itself, to command a specific finding that they are likely to fall into financial distress, let alone the repercussions of it. Of course, the council read the statute as we do. We have a first edition on that. When you look at the statutory factors, several of them go to the likelihood or the onset of financial distress. If you're highly leveraged and in a bad market, you're more likely to experience financial distress. Well, that could go either way, right? It could go both, but it certainly does go to that. Well, it depends on what question. I mean, looking at leverage itself doesn't, at least to me, answer the question of are we asking are they really leveraged so that they are likely to go in distress, or if bad economic times come, what kind of internal financial wherewithal do they have to withstand that in a way that doesn't take others down with it? And so what in the text compels? Because I thought you said the statute requires them to do it. I wouldn't say there's an explicit statutory compulsion, and I admit it would be a closer question, but we think it's unreasonable under Chevron Step 2 for this agency to embark on the process of designating a company and selling with an enormous cost if there's no real foreseeable possibility that it will experience financial distress in the horizon over which they have the opportunity to move forward. But do you agree we're all in Chevron Step 2 language on what this? I don't think there's an explicit statutory command that directly states it, but I think there's no permissible. So I think that means you agree we're in Chevron Step 2. I agree that I would say that read as a whole it is unreasonable to view the statute, and read as a whole the clear statutory command is you need to consider whether this company is reasonably likely. So is that Chevron Step 1 or 2? I would characterize it as Chevron Step 1 on balance, but certainly Chevron Step 2. It's just totally unreasonable to send an agency on a fool's errand. What do you do in the event of language? I think it still begs the question, is that event going to come about? The language at 5323 is the more specific to this enterprise, and I think is stronger for us. But if I could also mention, if I could turn to the other respect in which they departed from their standards, which is their exposure analysis, because there they departed from their own standards not only as stated in the final rule of interpretive guidance where they said they would consider whether exposures were significant enough to materially impair. They restated that standard in the designation itself, and yet never applied their own test. MetLife came forward with expert evidence that its third party's exposures were not significant enough to materially impair. For example, we have now- They did encant that language in the conclusion. They encanted it, exactly. On both, with respect to both of the routes. And wherever they cite it in the brief, that's exactly what they're doing. They're invoking a term, but they never applied the test, and they simply paid no heed to evidence. We showed that there wouldn't be material impairment. I want to talk for a moment just about the stress testing. What we did was we said, let's look at other federal models that some of these member agencies use to test the fortitude of a company, and we showed that the impact of a MetLife failure on the major banks, and the major banks are central to their analysis. We said the impact of a MetLife failure on the major banks, even assuming virtually a total loss, would be, for example, one-seventy-third of the impact of an adverse economic event that they withstood under the stress test. So we said to FSOC, if this bank can withstand the stress test, surely it won't be materially impaired by MetLife's failure. Can I just ask you a question, a context-setting question about this? So this deals with the way that the FSOC in the guidance defined how it was going to apply the threat standard, and it says that a threat to the financial stability exists if there would be an impairment of financial intermediation or of financial market functioning that would be sufficiently severe to inflict significant damage on the broader economy. So we're talking about the application of that verbiage. Although there's other verbiage throughout both the final rule interpretive guidance and the designation decision that talks about impacts on the counterparties. The theory is domino effect, and they never apply the domino theory. They just add it up, said, well, that's a lot of exposure, without taking account of federal stress test rules, which showed there wouldn't be a significant impact, without taking account of federal rules regarding collateral. We tried to explain to them just context. The CEO of this company told the council this was the biggest threat to the company in its history, getting designated. And so one thing we said, look at your federal banking rules regarding collateral. Treat collateral in the same way here as you treat it in the federal banking rules, and our exposure has dropped by $30 billion. But FSOC said we're not going to use federal rules regarding how collateral is treated. So Mr. Stern talked about how hard the task before FSOC was. But when a task is hard, you use these expert federal models that existed elsewhere. You certainly respond to the evidence on stress testing, on the analogy that we drew to fines the government imposed and how much larger they were than a mental health failure. It's not that the government had a bad argument. It ignored us. So is your argument that it's arbitrary and capricious, for example, on stress tests, not to conduct the stress test analysis that you put forward, it's arbitrary and capricious because it conflicts with the guidance? Or is your argument that it's just arbitrary and capricious not to take that into account because it's an obvious thing that should have been taken into account? Plano State Farm's significant evidence argument in the record that they didn't acknowledge or respond to, they just ignored it. And that was just garden variety, arbitrary, capricious, particularly in a context where it's federal rules and where they said we need guidance. Another place that they did it was with respect to simply their treatment of the state insurance expertise that Congress placed on that body. The independent state insurance experts on FSOC dissented. They said this is totally improbable. And they laid out in detail why it was that state regulators would intervene, how they always do that. And FSOC ignored that again. So it's claiming deference to expertise, but it ignored it. Let me just ask you one thing on the stress tests. How do stress tests measure impact on others as opposed to the ability of the company itself, again, to its own internal wherewithal? The stress test that was conducted by the Fed against the banks hypothesizes an economic impact on a bank and hits it really hard, a severely adverse scenario, and says how did that bank withstand it? What we did was we said let's look at how the impact on that bank of a MetLife failure compares to the adverse economic impact the Fed found that bank withstood. So we didn't suggest that a stress test be done on MetLife. We said let's compare the impacts and the survivability. And we said MetLife's impact is minuscule compared to what you, the federal government, said that bank can withstand. How can you now turn around and tell us that we're a threat to materially impair that very same bank? If I could talk to you. Well, isn't the question that's asked the impact of a MetLife failure or near failure at a time of already a severe downturn in the economy as opposed to a healthy economy? I'm sorry. So it's not just that MetLife is an island unto itself facing financial distress and everyone else is having rosy days. The assumption for the analysis here is we kind of have to assume things are really going badly and MetLife is at least on the brink of insolvency or severe financial failings and the rest of their partners or those that they interconnect with are themselves facing maybe not as far down the road as MetLife is hypothesized to be, but facing a severe economic downturn. And so how does a stress test capture that sort of double whammy? Well, they certainly did set the stage to make it much easier for themselves by drawing all those adverse assumptions. But the short answer, Your Honor, is they just never responded to the analogies that we drew to assess what Did your stress test, your analogy, your evidence analyze it on those terms or did it look at stress tests in ordinary financial times? And in that context, if for some reason a single failure of MetLife with everything else going along normally, what impact it would have? We did not. What we compared was a total loss of MetLife exposure, which was unreasonable for reasons we also explained, with an adverse economic environment that was severely adverse that the banks could withstand. We didn't put another context around the MetLife impact on the counterparty. On the other hand, they never even considered the evidence. They didn't respond in any way. Under Schenery, they're just out on that issue. Another issue they're out on that I do want to speak before I sit down is the asset liquidation scenario. Those 84 pages of the designation can be put aside for a simple reason. They all assume, the entire asset liquidation scenario assumes that MetLife won't act to stop and that the states won't act to stop the return of shareholder, the return of policies. The scenario they hypothesized was that MetLife was in such terrible shape that millions of policyholders were demanding their policies back. And yet, nonetheless, It's not just policyholders, right? There's a lot of people that hold debt the way MetLife system is set up. A lot of people hold a lot of money on MetLife. It's not just life insurance policies that are going to get turned in. I mean, I don't think that's quite fair for their analysis. It was much more comprehensive given the sort of short-term debt that MetLife holds. Those enormous numbers they generated for the asset liquidation were predominantly from insurance liabilities. And it disregards the state regulatory system. It disregards the state. They didn't disregard it. They analyzed it and they said, look, no one state regulator. And the whole point is that they're doing their own little pockets of what these businesses do and that there's nobody looking at MetLife as a whole and what that impact is going to be. But, Your Honor, MetLife also had its deferral authority that would have enabled it to stop the outflow. And what FSOC said was that MetLife might not exercise that because it would send a negative signal, which is a preposterous response. The deferral of power is required by state law. If your policyholders are coming to you by the millions, demanding their policies back, you're not going to be worried about sending a negative signal. What if it's not policyholders? What if it's people who hold debt? But, Your Honor, I'm getting at a slightly different point, which is how irrational it was for them to assume that MetLife wouldn't defer because it didn't want to send a negative signal. A death knell had already been sent. Under the scenario three, which MetLife told them was totally implausible, MetLife was not writing business anymore. If you called and tried to get a MetLife policy, they'd say, we don't do that anymore. And, again, the average Joe policyholder is banging down the doors to return his life insurance policy. FSOC said that in that circumstance, MetLife wouldn't exercise deferral, even though MetLife said we would have a fiduciary duty to do so. In every other insurance failure that's been examined, either there was deferral exercised or state intervention, and Judge Millett, with respect to the efficacy of state intervention, with all respect, it wasn't FSOC that had the expertise on that. It was the state insurance regulators, and there were about ten different letters submitted by state insurance regulators who said, we do this regularly, and it works very well. And the non-insurance experts on FSOC just speculated that, well, maybe it wouldn't work here. But that's not grounded in expertise. They essentially engaged in a flight from the expertise that Congress put on that body. Can I ask you to address a broader question, which is the statute has provisions that deal with banks, bank holding companies, and then has provisions that deal with non-financial companies. And as to the former, it occasions the Federal Reserve's authority any time there's $50 billion in assets, period, without worrying about a lot of the things that we've been talking about this morning, because it assumes that there's an interconnectedness and ripple effect and things of that nature that justify the added regulatory burden. If the FSOC goes through the analysis and determines that a company like MetLife has a similar scale of interconnectedness and it's similarly significant in the overall economy, then doesn't the fact that the statute speaks in terms of $50 billion automatically occasioning Federal Reserve authority suggest that a lot of the things we've been talking about this morning may be things that the FSOC could have looked at, but that they weren't out of bounds for not looking at them? Judge Sertoglossan, I agree there were other ways that this agency could have approached the designation of a non-bank SIFI. We're not asking you to ordain that there was one specific way that it could be done. What we're asking you to rule is that they set about doing it in a particular way and then they did it in an unreasonable way that disregarded evidence, didn't even respond to really important evidence, for example. With respect to your question more broadly, banks and insurance companies are different. And that's precisely why having assets significantly in excess of $50 billion when you're not a bank doesn't pose the same kinds of concerns that might in a bank. And briefly, banks are much more connected within the financial system and they're very prone to runs. One of the difficulties, Judge Millett, that we had with this run scenario they hypothesized is that it's a creature of the banking world where people have their money in a bank because they want ready access to their money, whereas you buy a life insurance policy for a completely different reason. MetLife hired a firm to examine historical insurance failures and they reflected an extremely different pattern than the failure of a bank. And in these analyses that Oliver Wyman did, the expert firm, it actually significantly increased the distress at MetLife and the asset sales that were going on far beyond any historical model. For example, Oliver Wyman's Scenario 2 was AIG, which was a highly publicly observed failure that took place over several months before the federal government intervened. That was Scenario 2. Nobody thinks Scenario 2 would adversely affect broader markets. Scenario 3, if you look at Joint Appendix 1187, you'll see the pace of asset sales, which MetLife told FSOC was totally implausible. It's far faster than had ever been seen from an insurance company. So we were willing to give some margin, some benefit of the doubt, to be protective. That Oliver Wyman Scenario 3 analysis still showed that MetLife could meet this totally unreasonable demand on its assets and still not adversely affect the economy, remembering again that if the state regulators do what they said they would do, what they historically do, what they're required by law to do, you would never be in that asset liquidation scenario. Can I ask you, I'd like to, before you sit down, one of the points you made, as I understand it, is that the council never considered the impact of designation on MetLife. The amicus brief filed by the academic experts points out that there's an executive order outstanding issued by President Clinton requiring the cost of regulation to be considered. My question is, does that executive order apply to this council, which is made up of various individuals? I don't know if it applies by its terms. It is an unusual body. It's not executive officers. It does. I believe the majority of its voting members are indeed executive officers. Now, some of them are independent agencies, so you have a difference there when it comes to the executive order. But what I would like to emphasize about that is, first of all, again, the Chenery Doctrine, which is so fatal to so much of what FSOC would like to argue now. They gave one reason for not considering the impact on MetLife and the broader economy of what the CEOs stood before these powerful regulators and said was the biggest threat in the company's history. They gave one reason, and here's what it was. They said, well, statutory sections A through J are the mandatory factors to consider. You're asking us to consider the adverse effects on MetLife and the broader economy under the catch-all at K. They said, well, we're not going to consider it under the catch-all at K because it's not one of the mandatory factors at A through J. I mean, that's just the quintessence. I think that's what they said. I think they said it's not looking at the same concerns. It was sort of the words known by the company it keeps, and so they wanted to make sure that when they talked about other risk-related factors down there that it would face the same types of risks as the factors that were before it. Isn't that exactly more how they did it? That's their position now. They didn't say it wasn't one of those other factors. They did. When you read that paragraph, they gave – I don't have the immediate page in front of me. I apologize, but I can find it quickly. They gave this all of one paragraph, and in it their emphasis was on what the statute required. They said because it wasn't statutorily required, they weren't going to examine it. Again, that makes hash out of a catch-all. I also want to emphasize that we were not asking for a quantitative cost-benefit analysis in the manner even of the executive order, Judge Randolph. All we were saying was because the statute is meant to be protective of designated companies, you ought to consider whether this will be protective or harmful. They said, well, it's not a statutorily mandated factor, so we're not going to want to consider it. Is MetLife's argument on that score that the designation itself will enhance the possibility that MetLife will go into financial distress? What we explained was that it would make MetLife less profitable, weaker. It would harm the company. And we didn't say it would drive it to bankruptcy. The designation or the prudential standards that the board would impose? At the time that we were before FSOC, until literally the last day, they were required to apply capital standards that were the same as those applied to banks, and that's what we analyzed it under. Those capital standards are extremely adverse for an insurance company. When you say they, are you talking about the board or the council? The Fed. But under any regime, the capital standards applied to FSOC are required to be higher than those otherwise applied, which means as a matter of law, once you're designated, you have to have capital standards higher than the great majority of your competitors. My understanding is that the board, once someone is designated, then makes an individualized, and it's okay if you don't need to hunt for it. I don't want to distract you. The board then makes an individualized study, and it may well, you're probably right in predicting there's certainly a good chance that it will impose these same requirements that it has out there. My question to you is more a procedural one. If the problem is the consequences of the regulations themselves, do you have an opportunity, my assumption is you do, have an opportunity to challenge whatever regulatory plan the board devises for MetLife? And if so, I assume you'd be perfectly free to raise this cost argument there once we have an actual regulatory program in front of us to look at. A two-part answer. As the law is now, because there was a congressional amendment that very day, as the law is now, once you're designated, you must have higher capital standards, which automatically makes you less profitable. As the law was until literally the day of designation, those capital standards also had to be the heightened standards applicable to a bank. There are other things that follow immediately from designation. You are subject to Fed oversight, which is among the most intrusive forms of regulation in the federal government. When we prevailed in this case before the district court, it resulted in approximately a dozen federal bank examiners who had been on our property for months to have to leave. And yet remarkably, the federal government argues in its brief that our constitutional interests weren't even implicated in this case. So there are a number of things that fall from designation. Your Honor, it's JA 391. I'm sorry. I'm sorry to have distracted you. I also want to briefly mention— That was the executive summary where they did that. Your Honor, that's what's disturbing about it. They gave one paragraph to our argument that you are going to harm this company. The CEO stood before these very powerful federal regulators and said this is one of the greatest threats we face, and they said that the impact of their actions was not of their concern, which is so extraordinary for a regulator to say, we're not really going to worry ourselves whether we adversely affect you or whether we even further the purposes of the statute. That's just garden-variety, arbitrary and capricious. On that part of it, whether it furthers the purposes of the statute, I guess, as I understood it, what's going on is to the extent that your argument is that designation occasions consequences that are adverse to the company, Congress viewed designation to be part of the cure. And it just seems a bit odd to say that the cure that Congress deemed warranted actually occasions the harm that Congress was trying to avert. Because Congress already decided what should happen. It might have been wrong or it might have been short-sighted, but from the agency's perspective, isn't the agency stuck with what Congress says should happen in these circumstances? Well, Your Honor, suppose I'm right. Suppose I'm right. Imagine an even more severe case where designation will indeed cause deep financial distress, cause failure, radiate out, and adversely affect the economy. Would Congress have wanted the counsel to consider that? Absolutely. But their answer was it's none of our business. It's none of our business to concern ourselves with the impact of our action, which is wrong. A related point, one of the reasons you look at impact and you look at cost is in order to consider better alternatives. And we got the same kind of answer on alternatives. And this was just a couple of sentences, and you might ask me where, and I might have to look, and I apologize. But it's hard to find, suffice it to say. I mean, this is, again, just Heartland State Farm. You consider the impacts to assess whether alternatives are superior. And one of MetLife's repeated points to FSOC was for asset managers who manage trillions more in assets, $5 trillion, $3 trillion, we said you're taking this activities-based approach. We'd ask that you take this activities-based approach for us. And, in fact, initially FSOC had been looking at company-by-company designation for asset managers, but now it's shifted toward activities-based approach, and MetLife said we'd like the same. And FSOC just said, well, we're not going to consider that for you because we're not considering that for you. That was their response, which is just Heartland, arbitrary and capricious. That sprang, in turn, from a process where the same people who had investigated and were now prosecuting the case against us were also involved in adjudicating it, which, in turn, manifested itself. And I think over some— Were they involved in the formulation of the regulations and the guidance, too? They were. Is that argument a due process argument or a separation of powers? It's both, Your Honor. The cases tend to focus a bit more on due process. I noticed that the government, or not the government, the council invokes a state court decision of the Supreme Court of the United States, which I take it has nothing to do with separation of powers. That's correct, Your Honor. And there are other important differences from Withrow. All Withrow said was you look at whether there's a risk of bias, and some mixing and blending by itself isn't enough, but we have more here. We have the fact that the record was withheld from MetLife, so there was secret evidence that we didn't even get to see. I just want to ask one predicate question. That sure sounds like a due process argument that you're making now, not a separation of powers one. What is the protected property interest? Judging by what they argue, there's not. It's manyfold. MetLife has paid millions in assessments to the government as a designated entity. That's required, I believe, is under Section 5330. As I mentioned, it immediately became subject to Fed supervision. There were about a dozen federal bank examiners on its premises for months or maybe a year after it got designated. That is obviously a direct constitutional interest. To me, it's remarkable. The government would have told you that we had no constitutional interest in avoiding paying millions in assessments, in avoiding being subject to federal supervision, in avoiding having bank examiners on its property. But, again, that comes to how cavalier FSOC was toward the consequences of what it was doing to this great American company. They also withheld from us their own precedents. They would not give us the proved designation decision or the AIG decision, even though obviously we would have wanted to pore over those to see how we could better frame our arguments. And yet when it came to litigation in the district court, they very quickly provided their decision against us to their amici so their amici could file briefs. That's not fair, and it reflects this prejudice, this lack of balance that was an outgrowth of the kinds of concerns that Withrow recognized are indeed very substantial. Your separation of powers argument, I understand that there's statutory requirements that were imposed upon you once there was designation. Those weren't imposed by the council. Did the council impose any regulations on you through its designation, distinct from what the statute already put in place? What the council did, Your Honor, is triggered duties and burdens that occur as a matter of law through designation. Congress said when they made a designation these things followed, and indeed they did. But the things that followed were imposed by Congress. But they were direct impacts on that life that certainly implicated its constitutional interest in not having to pay assessments and not having to yield some of its property to the heavy of bank examiners. So talking about due process, and simply my point there, is that Withrow talks about something more than just this mixing. You certainly had something more in this case. Unless there are any further questions, I just would like to emphasize again we're in the heartland of State Farm Arbitrary Capricious Review. You've heard from Mr. Stern that these are challenging decisions to make. All the more reason to call upon existing federal rules which would have informed what they were doing, like rules about collateral. All the more reason to give weight to the insurance expertise that Congress put on this body. FSOC cannot disregard the insurance expertise that Congress put on this body and then turn around and claim deference to judgments it made that were primarily about the insurance industry. Finally, what FSOC did was conducted this assessment in a manner that was not even-handed, so that measures that ordinarily are protective and are recognized as such both by the federal government and the states were suddenly turned into risk factors, including when the states intervened or when MetLife exercised its deferral authority. I'm sorry, just to clarify one thing going out of here. For all the reasons you've given, do you say that they all are both Chevron Step 1, reading the statute in a way that I guess you would say is reasonable and workable, or is this all your State Farm Chevron Step 2 and it's just a failure of appropriate analysis? Virtually all State Farm Chevron Step 2, Your Honor. Your Honor, we are not here making a tall claim that no insurance companies can be designated. We're simply saying that in this case, they made some very rudimentary errors that time and again this Court have recognized would result in vacating. And importantly, under the National Fuel Gas Supply decision of this Court, the failure of any part of their analysis is sufficient to doom the whole because they said they were relying on all parts and not resting on different components alternatively. Thank you. Thank you. Mr. Stern, we'll give you back three minutes to start. Thank you, Your Honor. There are a lot of things said. A lot of those are addressed point by point in our reply brief, sort of in probably more detail than I could hope to accomplish now. Your reply brief doesn't deal with the – I mentioned to Mr. Scalia the academic experts of ECAS brief. Your reply brief doesn't deal with that at all, does it? I'm sorry, Your Honor. Your Honor, was this the point about the requirement to take the cost benefit? Well, it was also that risk regulation necessarily involves an evaluation of the likelihood of the risk occurring. Your Honor, that's not what the risk is. And there are ample authorities. They cite Federal Reserve rules. They cite other agency rules to take that into account. I mean, Your Honor, nobody thinks that all the 30 banks that are subject to Federal Reserve regulation under Dodd-Frank are all likely to fail. I mean, that's not why we have these regulations. That's not the question. The question is whether they can take into account the likelihood of failure. Your Honor, that's whether they could take it into account or whether they needed to take it into account. And, again, if you look at AIG, which is really, you know, I think the sort of quintessential example of what Congress had in mind was it recognized that there were institutions that dealt heavily in capital markets that nobody had predicted were going to fail. I know you made that argument. But the reason I said could is because I understood your opening argument to mean or to say that it was impossible to do any kind of predictive judgment. I do think that it's very, very hard. Did the Council ever say that? Yeah. The Council does talk about that, and it talks about 2008, and it cites all of the—I mean, and it explains the background of this and says that once a financial crisis develops, how it's going to proceed is extremely difficult to predict. And what the Council did was not to say, this for sure will happen one way or the other. I mean, nobody can, like, do that. Like, what it said is these are the ways in which things could happen, and this is an institution that, you know, we can— like, there's a dispute about whether there's $183 billion of exposure. MetLife says, no, that's $90 billion of exposure because there would be recovery rates, to which the Council said, look, we're not saying that there's going to be $183 billion of losses on the part of your counterparties. What we're saying is this is a measure of how large and interconnected you are, and if you think that $90 billion of losses is the right figure, that's an extraordinarily high figure. I mean, it's hard to know who, like, other than— I mean, MetLife is the quintessential example of what Congress would have had in mind when it passed Dodd-Frank. I mean, you know, this is it. Now, when they—can you address some of their concerns about, at least in the exposure transmission channel and that part of the analysis, the lack of, as they say, concrete analysis of what the impact is going to be on other companies, such as using stress tests or such as using what they call CCAR testing, those types of things? What—there wasn't much—it's very big, and it reaches into an awful lot of industries with an awful lot of money on the line, and so therefore it's going to satisfy the exposure channel without anything more concrete? The Council's discussion is a whole lot more specific than that. I mean, I know that the length of a decision alone doesn't tell you whether it's a good and comprehensive decision, but I've actually read through these 341 pages a few times, and it's got—it is really— Yeah, but when you get to the exposure channel pages, which I've also read, there isn't a lot of concreteness there about the impact. It seems to be a determination. Maybe this is defensible or not. That's what I'm asking you, that, look, this is so big, so much money, and their exposure sort of tentacles reach in so many different—so deep and so far and so many places with so much money that we just conclude that there's bound to be the type of impact that would cause severe financial distress on the economy. Is that what they need to do, or do they need to— That's a reasonable enough-sounding argument that you can't just say we're really big and we're in a lot of areas. You really have to look at how it's going to impact the companies, and when you look at the companies by companies that they're interacting with, they can withstand it. Well, but the issue isn't whether any one company would go under. I mean, we discussed in our reply brief that the problem with AIG was not, as we know, that its specific counterparties were going to necessarily fail if AIG went under. It was the extent to which AIG was going to contribute to—like, the failure of AIG was going to contribute to, like, a really scary economic situation, and you don't have to— But you've already baked into the question you're asking in the first place a pretty scary economic situation, and that is that everybody in the economy is facing a severe downturn, and that MetLife, a company of that size, is on the brink of insolvency. So I don't think taking that assumption and trying to analyze its consequences, in analyzing those consequences, you're not specific enough when you say, well, it's really, really a bad situation here, so we assume bad things are going to happen. I mean, I just—I'd refer the court to—I mean, we give a lot of sites, particularly in our reply brief, and, I mean, in the end, the determination has to speak for itself, and we think the determination goes into, like, doesn't just say you're in a lot of places, you've got tentacles. It describes in detail the kinds of transactions, the securities lending program, the guaranteed investment contracts, multiple other financial instruments in the capital markets. It talks about who, like, counter parties are. I mean, it sort of walks through. So what about the testing that they point out could have been done but wasn't done? Is your response to that kind of testing, including the stress tests, is your response to that that it would have been counterproductive to do it, and there was a problem, or is it just that we could have done it, and maybe it would have been illuminating, but we just didn't have to? Well, I mean, I think there are a couple of answers. We note in our reply brief that the council did conduct some tests that, like, are sort of analogous to stress tests, but, again, the point of the stress test is to predict just, like, are you going, I mean, it sort of takes us full circle. I mean, the point of the stress test is are you going to fail? No, I thought the point of the stress test was to assess what happens in the event that the failure comes about. Doesn't it go to the way that the institution reacts in that situation also? Well, I think that there are two different arguments that were being made. One is that the council should have conducted a stress test, and the other is that there were stress tests done on banks and that the banks, like, wouldn't fail, like, and that, like, even banks that did a lot of business, like, with MetLife, weren't, like, weren't failing the stress test, and, again, the point is not whether any one institution would fail, and under that theory, what you would have is since only one bank in the June stress tests, like, came away with anything less than a total clean bill of health, what that's telling you is essentially, MetLife is that the council couldn't designate anybody, you know, and that's, you know, it's sort of an apples and oranges kind of question. It's, like, we aren't looking to see whether a particular bank, like, would go under. What we're looking at is sort of a whole series of events with lots of different counterparties, lots of third parties, and, you know, MetLife sort of poo-poos, like, the impact on third parties, but that's absolutely crucial because, as the council explained, those third parties don't necessarily know the risk, the exposure of MetLife's own counterparties. You get a freezing up, sort of, of the entire flow once things start to go downhill, and, again, it's... It just has to sound like the asset liquidation channel is driving everything here, that all this analysis of what they have, what they're going to do, how much they're going to have to call in, who's going to call in other things on them, all of that analysis seems to make it essentially foreclosed. It's hard to imagine how anything could ever, when it has... When it satisfies the asset liquidation council...asset liquidation factor, isn't going to necessarily satisfy the exposure transmission channel because, golly gee, there's really nothing more to look at because we've just found that they have a lot of... a huge amount of money, a lot of exposure. I mean, I've got to think that through, Judge Malat, but whether or not that's true, I don't think there's anything... Well, they have to find...I mean, according to the council, they have to meet both prongs of that test. No, I don't think that's true. No, that's not right. Well, at least they're telling us they relied on determinations under both prongs. Yes, but, I mean, look, if you look... I mean, if in the end, like, one looks at this and goes, gee, like, the exposure channel really is most informative in that it tells me about the problem of asset liquidation, and let's just assume that that was a conclusion. There's nothing wrong with that. You know, the question is, did MetLife apply the factors in the statute to make the determination? It did respond to, like, sort of the sort of various sort of pieces of information, you know, that were put forth. I'd like to say, like, in terms of, like, the cost-benefit analysis, which, like, the theory of the cost-benefit keeps changing a little bit. Is it, like, a cost...is it a cost-benefit to MetLife, or is it a cost-benefit to the overall sort of, like, point of the statute? Did that executive order apply to this counsel? I don't know the answer, Your Honor, but if it's an executive order that... I mean, I'm familiar with the executive order that applies to regulations. This isn't. I mean, this determination is not a regulation, so I don't know if... Well, the guidance is, in a way. One wonders whether the guidance was in compliance with the executive order and should be construed that way. I mean, the guidance is specifically not a regulation. I mean, it makes that very clear. So I don't think that the executive order by its terms would apply. The guidance is...the regulation is an interpretation of the statute. The guidance is an interpretation of the regulation. And the decision here is an interpretation of the guidance. I don't think that actually the guidance is an interpretation of the regulation. I mean, it's really just explaining, like, how the counsel is going to proceed. It makes very clear that it's not adding anything to the statute. Nor, of course, is it taking away anything from the statute. And the arguments about the impact... I mean, what the counsel itself said in the pages that were being cited is, look, we...the process of, like, the Federal Reserve's, like, credential regulations and what they're going to say. And, by the way, they haven't established, like, what the capital requirements may be. And they're supposed to, by statute, tailor these requirements for insurance companies. This is all, like, sort of out there, and it's the Federal Reserve Board that does this. It's not the counsel. And will that be subject to challenge once it's issued? Absolutely, Your Honor. I mean, they're regulations. I mean, the...what the counsel simply said is, look, our job in this is to make a determination. Federal Reserve regulations, if they are, in fact, counterproductive, because the statute looks quite clear, you're not supposed to be counterproductive. If the Federal Reserve regulations were, and I'm not obviously suggesting that they are or will be, but if they were, they would certainly be subject to challenge. Okay. Thank you very much. Thank you, counsel. The case is submitted.
judges: Srinivasan, Millett, Randolph